IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2018

**STATE OF TENNESSEE v. MARIO MYERS**

**Appeal from the Criminal Court for Shelby County**
**No. 15-03159    James M. Lammey, Jr., Judge**

**No. W2017-01917-CCA-R3-CD**

The Defendant, Mario Myers, was convicted by a Shelby County Criminal Court jury of attempted first degree murder, a Class A felony; aggravated assault, a Class C felony; reckless endangerment with a deadly weapon, a Class E felony; and intentionally evading arrest in a motor vehicle and creating a risk of death or injury to innocent bystanders or other third parties, a Class D felony. *See* T.C.A. §§ 39-12-101 (2018) (criminal attempt), 39-13-202 (2018) (version effective prior to January 1, 2019) (first degree murder), 39-13-102 (aggravated assault) (Supp. 2012) (amended 2013, 2015, 2018), 39-13-103 (Supp. 2012) (amended 2013) (reckless endangerment with a deadly weapon), 39-16-603(b)(1), (b)(3) (2010) (amended 2016) (intentionally evading arrest in a motor vehicle and creating a risk of death or injury to innocent bystanders or other third parties). The trial court sentenced the Defendant, a Range I offender, to twenty-five years for attempted first degree murder, six years for aggravated assault, two years for reckless endangerment with a deadly weapon, and four years for intentionally evading arrest in a motor vehicle and creating a risk of death or injury to innocent bystanders or other third parties. The court ordered that the sentences for attempted first degree murder and aggravated assault were to be served consecutively, for an effective thirty-one-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) he was incompetent at the time of the trial and has been denied due process because a competency evaluation was never performed, and (3) the trial court erred in excluding him from the courtroom during the sentencing hearing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jason M. Matthews (on appeal) and Dewun Settle (at trial), Memphis, Tennessee, for the Appellant, Mario Myers.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; Meghan Fowler and Marianne Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to an altercation with his then-estranged wife, Shoneisha Myers, and her boyfriend, Antoine Davis. The Defendant shot Mr. Davis, fled the scene with the Defendant's children, and was involved in a police chase. The Defendant and Ms. Myers were divorced at the time of the trial.

At the trial, Eddie Heaston, records custodian of the Memphis Police Department 9-1-1 Communications Department, identified a CD containing a recording of 9-1-1 calls and a document memorializing emergency response events and actions related to the calls. The recording and the document were received as exhibits.

Shoneisha Myers, the Defendant's ex-wife at the time of the trial, testified that she and the Defendant were in the process of divorcing and were living separately on October 14, 2012. She said that the Defendant came to her house on October 14 and that they had a verbal disagreement about their son. She said she was "sure it probably was loud." She said her boyfriend, Antoine Davis, came outside and interjected himself into the disagreement. She said the Defendant produced a gun, "was talking about a code" and "something about three feet," and fired two shots at Mr. Davis. She said that Mr. Davis was turning toward the house when the Defendant pulled out the gun and that Mr. Davis was shot in the back. She said that after he was shot, Mr. Davis ran and hid behind her car. She said that her knees buckled and she fell when the shots were fired. She said that she got up and lunged at the Defendant after he shot Mr. Davis and that the Defendant swung at her and hit her face, dropped his cell phone, grabbed her daughter, and sped away with her children. She said she called 9-1-1. She said that she was concerned about Mr. Davis but could see that he was not in imminent danger of dying and that her main concern was for the safety of her children.

Ms. Myers identified her voice in the recording previously introduced during Mr. Heaston's testimony. She was unsure whether the call was disconnected and said she did not recall whether she called again or a 9-1-1 operator called her back. Recordings of three calls were played for the jury. In the first call, Ms. Myers requested an ambulance and reported that a man had been shot. She stated that her estranged husband came to pick up her children. She said that she told him to "keep his hands off" the children, that her boyfriend came outside, that her boyfriend confronted the Defendant and told the Defendant "he thought [the Defendant] was weak and all that kind of stuff." She said the Defendant pulled a gun and shot Mr. Davis, waved the gun at her, and left in a black

Maxima with her children. In the second call, a man who identified himself as Willie Parham stated that the Defendant, whom he identified by name, shot a man and left in a black Maxima. Mr. Parham stated that he was a neighbor and had seen the shooting from inside his house. Ms. Myers then spoke to the 9-1-1 operator, stating that the Defendant had dropped a cell phone in her yard. She provided locations where the Defendant might go and stated he had three minor children, including her two, with him. She stated that her son had a mark on his chest and that the child told her "his dad" caused the mark. She said she told the Defendant to keep his hands off her son. She said her boyfriend came outside and told the Defendant he was "less than a man." She said the Defendant stated, "I know the code," and something that is unintelligible on the recording. She said the Defendant hit her face and dropped his cell phone. In the third call, the 9-1-1 operator questioned Ms. Myers about her name, the Defendant's name, the names and ages of her children, identifying information about the Defendant's car, whether the Defendant took the gun when he left the scene, whether the Defendant had any psychiatric diagnoses, and the Defendant's address.

Ms. Myers testified that her lip was swollen and "kind of busted up" after the Defendant hit her. She identified photographs of her injuries, and the photographs were received as exhibits. She identified photographs of her home, which were received as exhibits. Referring to one of the photographs, she identified where Mr. Davis had stood on her porch and said she had been "lower down at the steps" with Mr. Davis behind her. She said Mr. Davis was "not very far" behind her. She said Mr. Davis did not go into the yard where the Defendant stood until after Mr. Davis had been shot. She said that after he was shot, Mr. Davis jumped from the porch and went behind her van. She said that after the Defendant fired the shots, she stepped off the porch step and that the Defendant hit her. She said she did not move from the steps until after the shooting. She said her daughter had been "somewhere in the yard" when the events occurred. She identified a photograph of a car that she said looked like the car the Defendant drove from the scene.

Ms. Myers testified that she and the Defendant had been separated for about two years on October 14, 2012. She agreed that the Defendant came to her home for his visitation with their children, but she said she had asked him not to come to her house because she wanted to take the children to him. She said several neighborhood children had been outside playing with her children. She said the children came inside and told her the Defendant was outside, which surprised her. She said the Defendant brought a male child with him who was a friend of their son's and agreed that by the time of the shooting, their son and his friend were in the Defendant's car.

Ms. Myers acknowledged that she was upset the Defendant had come to her house against her wishes but was more upset about his hitting their son. She said the Defendant did not like what she said but did not know "what his temperament was." She said that before the day of the shooting, the Defendant and Mr. Davis did not have a relationship

-3-

and were "[p]retty neutral" toward each other. She said their contact occurred when the Defendant came to pick up the children.

Ms. Myers testified that she did not see the Defendant "go after" Mr. Davis after the shots were fired. She said the Defendant grabbed her, "yelled for her to come back," and "basically like forc[ed] her to the car."

Antoine Davis testified that he dated Ms. Myers from approximately 2009 until 2014 and that they were dating in October 2012. He said that on October 14, 2012, he was at the home he shared with Ms. Myers and her two children. He said that Ms. Myers had told the Defendant not to come to pick up the children and that she would bring the children to the Defendant. Mr. Davis said the Defendant arrived despite the conversation with Ms. Myers.

Mr. Davis testified that after the Defendant arrived, Mr. Davis saw the Defendant and Ms. Myers arguing outside. Mr. Davis said that he went outside to see if everything was okay and that he told the Defendant not to come to the house without notifying Ms. Myers. Mr. Davis said he asked the Defendant "why [the Defendant] was telling his son that me and his mother was like having sex with him – with the child." Mr. Davis said that during the argument, Ms. Myers was on the stairs and the Defendant was in the yard. Mr. Davis said that Ms. Myers had told him that the Defendant carried a pistol.

Mr. Davis testified that after he asked the question about what the Defendant allegedly said to the son, the Defendant pulled out a gun and said, "I know the three-foot rule where I'll, you know, blow your chest out." Mr. Davis said he interpreted this as a threat that the Defendant was going to shoot him. Mr. Davis said that he turned to go into the house and that he was shot in the back. Mr. Davis said he had been unarmed. Mr. Davis said that after he had been shot, he jumped off the porch and went around to the back of the house.

Mr. Davis testified that he was shot once. He said the bullet entered his back, ricocheted, and came out his arm. He said he thought the Defendant had tried to kill him and that he had feared for his life.

Mr. Davis testified that Ms. Myers's face had not been injured before she went outside and argued with the Defendant. Mr. Davis said that after he returned from jumping from the porch and going behind the house, Ms. Myers "had like a scar on her face" that she stated had been caused when the Defendant "punched her in the face."

Mr. Davis testified that when the police arrived, he identified the Defendant as the person who shot him. Mr. Davis identified photographs of his gunshot wounds, and the photographs were received as exhibits. Mr. Davis said the healing process took three to

four months and that he had scars on his back and arm. He said he did not have to stay overnight in the hospital. He said that the Defendant was the only person who had a weapon that day and that the Defendant had not produced a weapon until Mr. Davis went outside. Mr. Davis said that neither he nor Ms. Myers made a move to come off the steps before the shooting.

Mr. Davis testified that before the day of the shooting, he and the Defendant had engaged in several conversations. He later said they talked about three times a year. He described the conversations as friendly and recalled that they had discussed Mr. Davis's "side job" selling laundry detergent. Mr. Davis said he and the Defendant had never had a physical altercation until the day of the shooting.

Mr. Davis testified that during the altercation, a female child was playing across the street and a male child was in a car with a friend. Mr. Davis said that other neighborhood children were outside across the street and that other adults were in the vicinity. He said that a neighbor, Mr. Parham, attempted to help him after he had been shot.

Mr. Davis testified that he viewed a photograph lineup that day or the following day and that he identified the Defendant as the person who shot him. The photograph lineup was received as an exhibit.

Willie Parham testified that he heard a gunshot while sitting in his front yard on October 14, 2012. He said a man ran out of a house with another man running behind the man. Mr. Parham agreed that both men had come outside the house. Mr. Parham said, "The first man ran behind the house, and he shot again, and the other one came back around the front." Mr. Parham later said that the first man who ran from the house and ran behind the house did not have a gun and that the second person ran out of the house with a gun and shot the first man. Mr. Parham said the shooter stopped at the corner of the house and shot at the first man. Mr. Parham said the shooter "came back out front and said something to the girl and got in" a black Maxima. Mr. Parham said he heard voices when he heard the gunshots but did not recall what was said. He acknowledged that if he had told a police officer in October 2012 that he heard a male shout, "I'm gonna kill that m----- f-----," this was what he had heard. Mr. Parham said he held a cold cloth to Mr. Davis's wound and that he called 9-1-1. He identified his voice in one of the 9-1-1 calls from the recording previously received as an exhibit. He said his voice was not the male voice that identified the Defendant by name as the shooter.

MPD Officer Muchon Swayze testified that he responded to the scene of a shooting on October 14, 2012. He said he photographed a bleeding male victim. Officer Swayze said "the wife" advised him that the shooter left the scene in a car with children

and that he communicated this information along with a description of the car and the suspect to others in the police department.

Memphis Fire Department Paramedic Joshua Malone testified that he responded to the scene and attended to Mr. Davis. Mr. Malone said Mr. Davis had gunshot injuries to the left arm and to the back between the left shoulder blade and the spinal column. He said the left lung was in the vicinity of the back wound.

MPD Sergeant John Morris testified that he was on patrol duty on October 14, 2012. He said that he heard a radio broadcast about a black Nissan Maxima and that he recalled having seen a car matching the description at an intersection. He said that he looked where he had seen the car but that it was no longer there, even though the traffic light was still red. He said he went in the direction he thought the car would have traveled and found it. He saw three children in the backseat and an Arkansas temporary license tag, and he confirmed by radio communication that this matched the description of the car driven by the suspect. He said he followed the car and eventually turned on his car's blue lights and siren, but the driver did not stop the car. He said that the car continued traveling on the interstate toward downtown Memphis and that he followed it with his car's blue lights and siren still activated. He said two other patrol cars with activated lights and sirens followed him. He estimated that he followed the Maxima for ten to fifteen minutes before it entered the interstate. Sergeant Morris said the Maxima left the interstate and drove on downtown Memphis streets for five to ten minutes until it was forced to stop by other traffic. Sergeant Morris said that "several" police cars were involved in following the Maxima. He estimated the total time he followed the Maxima as twenty-five to thirty minutes.

Sergeant Morris testified that after the Maxima stopped, he and other officers approached it and ordered the driver to get out. Sergeant Morris said that the driver "didn't immediately comply" and that the officers removed the driver from the Maxima, placed him on the ground, and handcuffed him. He identified the Defendant as the Maxima's driver. Sergeant Morris said the Defendant stated that "he was on his way to 201 Poplar to turn himself in."

Sergeant Morris testified that three children were in the backseat and a handgun was between the driver's seat and center console of the Maxima. He said he and other officers secured the scene until crime scene investigators could arrive.

MPD Officer Timmy Mitchell testified that on October 14, 2012, he joined an in-progress police pursuit of a shooting suspect in a Nissan Maxima. He said that he was with his partner, Officer Greg Robinson, and that officers in other vehicles were also involved in the pursuit. Officer Mitchell said that his car's blue lights and siren were on and that he followed the suspect for a while, traveling from Airways Boulevard to

downtown Memphis. He said that the blue lights and sirens on all police cars were activated during the pursuit. He said he and Officer Robinson addressed the Defendant on a "PA system" in an effort to get the Defendant to stop.

Officer Mitchell testified that the driver did not stop the Maxima until the car was "kind of barricaded" by other vehicles. Officer Mitchell said he, Officer Robinson, Sergeant Morris, and another officer, whose identity he did not remember, removed the driver from the Maxima. Officer Mitchell identified the Defendant as the Maxima's driver. Officer Mitchell said he saw a handgun in the Maxima between the driver's seat and the center console. Officer Mitchell said he talked to the Defendant, whom he knew, and the Defendant stated that the children were his and that "the guy" should not have involved himself in the Defendant's relationship with the Defendant's wife and children.

MPD Lieutenant Byron Braxton testified that he responded to the scene where the Defendant had been apprehended. He said he observed a handgun "sticking up in the center console" of the vehicle that had been driven by the Defendant. Lieutenant Braxton said he spoke to Mr. Parham and Ms. Myers.

MPD Officer J.R. Rector, a crime scene investigator, testified that on October 14, 2012, he photographed and collected evidence from a black Nissan Maxima. He said he collected a Smith and Wesson nine-millimeter semi-automatic handgun, two MP3 players, and approximately $2000. He identified photographs he took of the evidence, which were received as exhibits. Referring to a photograph depicting the gun, he said the gun was partially jammed, with the slide "partially rearward" and a live nine-millimeter bullet exposed. He said the partial jam would interfere with firing the gun. He said a photograph depicted the rear passenger-side seat from which he recovered the money.

Officer Rector identified a Smith and Wesson handgun as the one he collected from the Maxima, and the gun was received as an exhibit. He said he had removed the magazine and the partially chambered bullet in order to make the gun safe. He said that the magazine had a capacity of fifteen bullets, that it contained eleven live rounds, and that after taking into account the partially jammed bullet in the chamber, three bullets were unaccounted for from the magazine.

The defense did not offer proof. After receiving the evidence, the jury found the Defendant guilty of attempted first degree murder of Mr. Davis, aggravated assault of Mr. Davis, reckless endangerment with a deadly weapon of Ms. Myers, and intentionally evading arrest in a motor vehicle and creating a risk of death or injury to innocent third parties or other bystanders. The jury acquitted the Defendant of the domestic assault charge. Following the sentencing hearing, at which the trial court imposed an effective thirty-one-year sentence, the Defendant filed the present appeal.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. The State contends that the Defendant has waived consideration of this issue by providing an inadequate legal argument but that, in any event, the evidence is sufficient to support the convictions. We conclude that the evidence is sufficient to support the Defendant's convictions.

As a preliminary matter, the State argues that the Defendant has waived consideration of this issue because his brief does not contain a legal argument to support it. In his brief, the Defendant has recited the legal standard for review of the sufficiency of the evidence and the definitions of the crimes of which he was convicted. He then summarily contends that "the proof is insufficient to support" his convictions. With regard to his argument relative to the attempted first degree murder conviction, he contends that "no reasonable juror could have concluded that the Defendant was one of the shooters during the carwash shooting," an argument that does not correspond with the facts of the present case. He argues relative to the attempted first degree murder and aggravated assault convictions that "the evidence presented is mere testimony by witnesses who had motivation to lie" but does not identify which witnesses' testimony he challenges, which portions of those witnesses' testimony he contends is false, and what evidence shows that the witnesses testified untruthfully. With regard to the reckless endangerment conviction, he simply states that no reasonable juror could conclude he committed the offense. His argument regarding the evading arrest conviction states that "no reasonable juror could have concluded that only Mr. Myers evading arrest [sic]."

The Rules of Appellate Procedure require that a party's brief contain an argument which sets forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" T.R.A.P. 27(7)(A). This court's rules provide for waiver of issues which are unsupported by argument. *See* Tenn. Ct. Crim. App. R. 10(b) (Issues unsupported by argument are waived.). Although it is within our authority to treat the Defendant's sufficiency of the evidence issue as waived, we will, in the interests of justice, address the issue on the merits. We caution counsel, however, that compliance with the Rules of Appellate Procedure is expected.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514,

521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.     Attempted First Degree Murder

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another.  T.C.A. § 39-13-202(a)(1) (2018) (version effective prior to January 1, 2019).  In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2018) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result").  A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).  The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing.  *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).  Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).  As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008).  Factors from which a jury may infer premeditation include:

[D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2) (2018).

Viewed in the light most favorable to the State, the evidence shows that the Defendant was involved in a verbal altercation with Ms. Myers and that Mr. Davis intervened. The Defendant produced a gun and told Mr. Davis he would "blow [his] chest out." Mr. Davis interpreted the Defendant's statement as a threat and turned to leave. The Defendant fired two shots at Mr. Davis, one of which struck Mr. Davis in the back. Mr. Davis was unarmed. This evidence shows that the Defendant engaged in conduct that could cause Mr. Davis's death and that the Defendant intended to kill Mr. Davis. The Defendant produced the gun, announced his intent to shoot Mr. Davis before firing twice at Mr. Davis. The Defendant engaged in this conduct even though Mr. Davis was unarmed and was attempting to remove himself from the disagreement.

To the extent that the Defendant contends that the witnesses who testified about the incident were biased and had a motivation to lie, we note that questions of witness credibility and the weight to be afforded the evidence are within the exclusive province of the jury as the trier of fact. As such, we decline this invitation to reweigh the evidence. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547.

The evidence is sufficient to support the attempted first degree murder conviction.

B.  **Aggravated Assault**

The Defendant's aggravated assault conviction relates to his conduct toward Mr. Davis. Assault is defined, in relevant part, as "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury[.]" T.C.A. § 39-13-101(a)(2) (2010) (amended 2013, 2016, 2018). A defendant commits aggravated assault when he "[i]ntentionally or knowingly commits an assault . . . and . . . [u]ses or displays a deadly weapon[.]" *Id.* § 39-13-102(a)(1)(A)(iii) (Supp. 2012) (amended 2013, 2015, 2018).

"Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

*Id.* § 39-11-16(a)(20).

Viewed in the light most favorable to the State, the evidence shows that, during the argument, the Defendant produced a gun and said he knew "the code" and would "blow [Mr. Davis's] chest out." This conduct was sufficient to cause a reasonable person to fear imminent bodily injury, and the evidence supports a conclusion that the Defendant engaged in the conduct in order to threaten or intimidate Mr. Davis. With regard to the Defendant's argument that unspecified witnesses had a motivation to testify falsely, we decline to reweigh the evidence and conclude that it is sufficient to support the aggravated assault conviction.

## C.    Reckless Endangerment

The Defendant's reckless endangerment conviction relates to his conduct toward Ms. Myers. "A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a) (Supp. 2012) (amended 2013). If the offense is committed with a deadly weapon, it is a Class E felony. *See id.* at (b)(2).

"Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

*Id.* § 39-11-106(a)(31).

Viewed in the light most favorable to the State, the evidence shows that the Defendant fired two shots from a handgun at Mr. Davis, who was standing behind and near Ms. Myers. This conduct placed Ms. Myers in imminent danger of death or serious bodily injury. In so doing, the Defendant consciously disregarded a substantial and unjustifiable risk that Ms. Myers would be injured or killed by a stray bullet. The evidence is sufficient to support the felony reckless endangerment conviction.

**D.     Evading Arrest**

As pertinent to the present case, "It is unlawful for any person, while operating a motor vehicle on any street, road, or highway . . . to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." *See id.* § 39-16-603(b)(1) (2010) (amended 2016). If "the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties," the offense is a Class D felony. *Id.* at (b)(3).

Viewed in the light most favorable to the State, the evidence shows that the Defendant led the police on a twenty-five to thirty minute chase through the streets of Memphis and on the interstate, stopping only when traffic blocked him from continuing. Police officers activated their sirens and blue lights while following him, and officers broadcast a command on a PA system for him to stop, but the Defendant did not yield to their authority. The Defendant had three children in his car throughout the pursuit, and several police officers and vehicles were involved in the attempt to apprehend him. The evidence is sufficient to show that the Defendant intentionally fled from the officers despite having been instructed to stop and to show that the children in the backseat of his car were endangered by his prolonged refusal to yield to the command to stop. The Defendant is not entitled to relief on this basis.

**II**

**Denial of Due Process Due to Lack of a Competency Evaluation and Lack of Competency**

In a series of related issues, the Defendant contends that an unspecified issue existed regarding his "mental condition at the time of the offense," that his due process rights were violated because he did not have a competency evaluation, and that he lacked competency to stand trial. The State contends that the Defendant is not entitled to relief. We agree with the State.

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee constitution prohibit the trial of a person who is mentally incompetent." *State v. Reid*, 164 S.W.3d 286, 306 (Tenn. 2005); *see Pate v. Robinson*, 383 U.S. 375 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000). A defendant is competent who has the "capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975); *see Reid*, 164 S.W.3d at 306. A defendant must establish his incompetence by a preponderance of the evidence. *Reid*, 164 S.W.3d at 306-07. A trial court's findings regarding competency are

conclusive unless the evidence preponderates to the contrary. *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); *Reid*, 164 S.W.3d at 306.

The record reflects that the Defendant was uncooperative with the trial court's order for a mental evaluation and with the defense counsel appointed to represent him. On December 16, 2015, defense counsel requested a mental health evaluation of the Defendant. Counsel advised the court that although the Defendant appeared to be intelligent, counsel had encountered difficulty communicating with the Defendant. The Defendant voiced his objection to the mental health evaluation and asserted, "[T]his is a conflict of interest because it violates my constitutional law or rights." The Defendant further asserted that counsel should be recused on the basis that "it's a conflict of interest for me to sign up with a state licensed attorney because their first duty is to the courts. So, they are officers of the courts." The court granted defense counsel's motion for a mental evaluation of the Defendant.[1]

At a February 1, 2015 hearing, defense counsel stated that the Defendant would not communicate with counsel and had expressed a preference to speak directly to the trial court. When the court inquired whether the mental evaluation had been completed, the Defendant stated that he did not need a mental evaluation and inquired whether the order for an evaluation was "lawful" and whether he was compelled to consent to the evaluation. The Defendant became argumentative with the court, and the court found the Defendant in contempt several times. The Defendant questioned the authority of the court and asserted that he was competent. The court explained that the mental evaluation was necessary in order for the case to progress. The Defendant stated his intent to petition the federal courts for relief from the trial court's mental evaluation order.

At a March 8, 2016 hearing at which the Defendant was not present, defense counsel informed the trial court that the evaluation was to be performed the following day. At an April 4, 2016 hearing, the Defendant was again not present, and defense counsel informed the court that the Defendant had refused to cooperate with the professionals who had traveled to the jail to perform the mental evaluation. The prosecutor noted that this was the Defendant's second refusal to cooperate. The court reset the matter for the following month in order to give the Defendant another opportunity to cooperate in the evaluation. The Defendant was brought into the courtroom, and the court informed him that he would have one more opportunity to cooperate with the mental evaluation and that if he did not, the case would be set for trial.

At a May 3, 2016 hearing, defense counsel informed the trial court that the mental evaluation had not been performed due to the Defendant's unwillingness to participate.

---

[1] Although no order appears in the record, the transcript reflects that the order was granted on December 16.

The Defendant addressed the court directly, stating that the Defendant's conflict of interests issue had not been addressed and asserting that he could not have a fair trial because all attorneys were officers of the court. The Defendant argued that a nolle prosequi was appropriate because a different prosecutor was representing the State than the original prosecutor. The court set a trial date and, after the Defendant questioned whether the court had issued a lawful order, the court found the Defendant in contempt.

On July 1, 2016, the trial court noted on the record that the Defendant had filed motions without the aid of his counsel. The court stated that the Defendant was represented by counsel, with whom the Defendant had not cooperated, and declined to consider the motions on the merits.

On October 3, 2016, after defense counsel informed the trial court that the Defendant would not speak to counsel, aside from advising counsel that he thought speaking to counsel posed a conflict of interests, the court made the following observations:

> That's further reason why I won't let [the Defendant] represent himself if he thinks – I mean, if he doesn't recognize our laws, he won't cooperate with his attorney, he won't cooperate with me. He doesn't recognize the authority of the court – all those reasons. You know, I don't remember if he even asked if he wanted to represent himself. I think he just doesn't want to be here.

The court set the case for trial on October 24, 2016.

On the day of the trial, the Defendant continued to claim that the trial court had no authority over him and that a conflict of interests existed. The Defendant asked to represent himself, and the court denied the request. The Defendant stated that he did not need to be in the courtroom and did not consent to the proceedings, and the court advised the Defendant of his constitutional right to be present. The court observed the following:

> I just wanted to make sure that . . . if there is a conviction and it goes up that it's been noted, for the record, that he has – everything that we could possibly do to protect his rights has been done; nothing has been short-cutted [sic] or anything like that. He's been given an opportunity to defend himself even though he insists that these foreign national – or something – I'm not sure exactly what the deal is. That's why I wanted him mentally evaluated. But, for the record, he didn't go along with that either. And, so, we're just . . . stuck in a posture where we have to go forward. The State of Tennessee and their victims have a right to have this case tried as well.

And, you know, I've tried to reason with him. He just keeps talking about this since I'm a public official, that I don't have jurisdiction.

The mental competency evaluation was requested by defense counsel due to the Defendant's unwillingness to communicate with counsel. The Defendant, however, asserted that no mental competency evaluation was necessary, and he repeatedly refused to cooperate with the individuals who were assigned to conduct the evaluation. The trial court afforded the Defendant the opportunity for a mental evaluation, and the Defendant's own conduct is the reason no evaluation was performed. He cannot now be heard to complain that he did not receive the evaluation. *See* T.R.A.P. 36(a) (stating that relief is not required when the party requesting relief is responsible for any error).

The Defendant's statement of the issues includes "Mental Condition at the time of the alleged offense," although his brief does not contain any argument which is specific to this issue or otherwise explains it. A defendant may use evidence of his mental state at the time of the offense to establish a legal insanity defense. *See* T.C.A. § 39-11-501 (2010) (amended 2015). The Defendant did not raise a legal insanity defense at the trial, and his argument on appeal regarding mental issues otherwise pertains to his competency to stand trial. To the extent that his brief raises a question regarding his mental condition at the time of the offenses, we conclude that consideration of the issue is waived both because he did not raise a legal insanity defense at the trial and because he has not provided adequate legal argument on appeal. *See* T.R.A.P. 27(a)(7), 36(a); Tenn. R. Ct. Crim. App. 10(b).

We turn to the Defendant's argument that he was incompetent to stand trial and his related issue regarding whether he was competent to understand and waive his right to testify, which we consider as part of his broader argument that he was incompetent to stand trial. As we have stated, a defendant has the burden of establishing his incompetence for trial. *See Reid*, 164 S.W.3d at 306. Put another way, a defendant is presumed to be competent. *See id.* The Defendant was presumed competent, and he refused to cooperate with a mental evaluation geared toward determining whether incompetency existed. The evidence of record does not establish that he was incompetent. Because he failed to carry his burden of demonstrating incompetency, he is not entitled to relief on this basis.

We acknowledge the documents the defense has filed as an appendix to its brief. These documents include purported writings of the Defendant and letters from mental health evaluators regarding the Defendant's "questionable" competency for trial in another case. While we appreciate and understand defense counsel's difficult position in representing a client who has refused to cooperate with counsel and with the appointed mental health evaluators and who does not recognize the authority of the courts of this state, this court is generally limited to consideration of the facts which were established

-15-

in the trial court and are included in the appellate record. *See* T.R.A.P. 13(c); *see also UT Medical Group v. Vogt*, 235 S.W.3d 110, 122 (Tenn. 2007) (stating that documents attached to a party's brief but which were not included in the appellate record were not properly before the appellate court). As such, these documents are not properly before this court.

Finally, we have not overlooked the Defendant's argument that his due process rights continue to be violated by this court's denial of a motion for extension of time, which he sought on the basis that additional time was necessary to obtain a mental health evaluation. As we have stated, as an appellate court, we are generally limited to consideration of those facts which were established in the trial court and are included in the record. *See* T.R.A.P. 13(c). Our jurisdiction is appellate, and any new evidence showing that the Defendant is incompetent would not be instructive in consideration of the remaining issues raised on appeal. *See* T.C.A. § 16-5-108(a)(1) (2009). No due process violation has been shown.

### III

### Exclusion of the Defendant from the Sentencing Hearing

Finally, the Defendant contends that the trial court erred in excluding him from the courtroom during the sentencing hearing. The State contends that the Defendant has waived consideration of this issue by failing to provide an adequate legal argument and that plain error relief is not appropriate. We agree with the State.

In his brief, the Defendant has stated the issue regarding his exclusion from the sentencing hearing, but he has not provided any legal argument to support it. *See* T.R.A.P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b). He has waived consideration of the issue on the merits, and he is entitled to relief only if plain error exists. *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

The record reflects that, at the sentencing hearing, the Defendant was argumentative with the trial court, stated that he had sent motions to the State, and raised numerous objections to the court's authority and to the proceedings. Defense counsel stated that although he "would love to have [the Defendant] here," counsel's presence was sufficient for purposes of the sentencing hearing. The court stated that the Defendant had a right to be present but that the court was "not going to entertain frivolous motions." After the Defendant continued to disrupt the proceedings, the court had the Defendant removed and conducted the hearing in his absence.

Notwithstanding a defendant's federal and state constitutional rights to be present at all critical stages of a criminal proceeding, he may waive his right to be present when he persists in disruptive conduct despite a warning from the court that he will be excluded

if he continues to disrupt the proceedings.  *See* Tenn. R. Crim. P. 42(b)(2); *State v. Carruthers*, 35 S.W.3d 516, 565-569 (Tenn. 2000).   The Defendant's repeated misconduct was the basis for the trial court's excluding him from the sentencing hearing. We are unpersuaded that plain error exists.  *See Adkisson*, 899 S.W.2d at 641-42.  He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE